The next case for argument is 15-1185 AEON Group v. Defense Finance and Accounting Before you begin, Mr. Rizzo, I just want to say that we can take it as a given that anything that involves the Defense Finance and Accounting Service is going to aggravate my arthritis. I'm sorry, I couldn't hear it because your... I said your record is too heavy. Not too large, just too heavy. Understood, understood. May it please the court, I am Mike Rizzo and I do represent the appellant, the AEON Group, LLC. And there are two issues that we want to cover today, one in more detail than the others. The first issue, the government terminated my client's contract for default. And after the trial, the board determined that my client, in fact, had defaulted in its performance of the contract. And also that the, I think the record shows it's $12.9 million. In the blue brief, you assert that the system did have full functionality at the conclusion of GT&E government testing and evaluation. In your argument section at 19, you say it had, it quote, had functionality. And then you say it had, quote, major functionality. And then that's at 21. And then at 21, you say it had basic functionalities. In the joint appendix at 1169, there's testimony that basic functionalities were there. But that it, quote, just wasn't working to what could be fielded, where it could be fielded, i.e. used. Similarly, in a March 22, 2007 status summary, which is at 1646, it says, quote, major functionality does not work. Are you asserting that the contract requirement of 100% functionality was met? And if so, what in the record supports that? We are asserting that the government had the burden of proof during the trial to demonstrate that at the conclusion of GT&E, which was April 10, 2007, the system lacked functionality. And we are asserting that there is not substantial, that the board ignored substantial evidence in Eon's favor on that issue. And this is important because terminations for default are draconian. But the problem is the thing didn't work. There is no dispositive evidence that as of April 11, 2007, the thing did not work. Did it work 100%? Was it completely functional? Our client's position is that it was. But our position is that the government did not present evidence they had the burden at the trial. And that the government did not have evidence that as of the date of termination, and recall that the contract was terminated for two reasons. One was a failure to cure, and the cure notice was... I understand. On this point, the government makes two arguments. Firstly, they say you were required to have 100% functionality at the beginning of the GT&E, not at the end. So that was default there. But they argue, and I think there is evidence in the record, that even if you take your date of April 2007, it still wasn't 100% functional. Okay. Now you said something kind of a little odd, which is the board ignored our substantial evidence? The board, there is not substantial evidence to demonstrate that the re-hosted system did not have 100% functionality as of April 11. As I recall, I read the testimony, and the testimony from the government witnesses was that the thing wouldn't integrate. Now, assuming that that's true, how could it be 100%? There are a couple of points I'd like to make. One is, the testimony that was presented during the hearing did not match the record during the hearing, and we think that it was error not for the government to have a record that matched the testimony. So let me give you a couple of examples. There is one test. It's error... Wait a second. Look back at what you just said. Okay. It was error for the government not to have testimony that matched the record. Let me clarify that, Your Honor. I apologize. It was an error for the Armed Services Board of Contract Appeals to determine that the testimony of the government was credible in light of the documentary record. But that's weighing evidence, is it not? I understand your point, but there was evidence from the government's lead tester, Carol Turner, that the government didn't conduct any testing after April 11, 2007. Yeah, they stopped. Correct. They stopped because the thing wasn't working. Your position seems to be that the government bore responsibility to provide testers, which are in fact provided for in the contract as your responsibility, but the government is supposed to then come in when it does its testing and do your work. That's sort of the core of your argument, isn't it? That is not the core of our argument. Peripheral? I don't even think it's peripheral. There is a test plan that's in the record. The test plan that is in the record that the government wrote, which is in the fourth volume of the appendix, states that the parties should expect to find functionality defects during GT&E. It states that the testers on the government side and the testers on EON's side will meet daily during GT&E to resolve those defects. Conversely, when you get to the end of GT&E, there needs to be a comprehensive test. There needs to be a test that demonstrates does this work or does it not work. This is particularly important when the company that's performing this contract is a small business. If it gets terminated for default, it's the most draconian thing that can happen to it. It goes on its past performance records for a period of five years so that everybody who wants to hire this company knows, oh, they were terminated for default. Under those circumstances, there should be an obligation on the government to conduct a demonstrative test which demonstrates, does this thing work as of April 11th or doesn't it? Because that's the ground of termination. That's the reason that they terminated the contract. We've got, as Judge Wallach pointed out earlier, a huge record. Yes, we do. The board evaluated this, weighed all the evidence, weighed all the testimony, and concluded there clearly was substantial evidence based on credibility and other things to conclude that there was no 100% functionality even if you used the April 10th date, correct? The board made that determination. We believe that that determination is not supported by substantial evidence. Do you want to go on to the next issue? Yes. The performance-based payments issue. On this issue, this is a de novo issue. It's our position, and I think the government agrees with this, that this court is entitled to determine as a matter of law whether EON has to repay the performance-based payments it received under the contract. There were $12.9 million it received. I'll just point out a couple of regulations first before I get into my argument. The first one is FAR 32-1004. The regulations state that performance-based payments can either be made on a whole contract basis or on a delivery item basis. Then, more importantly, the contract clause that's in the contract is FAR 52-232-32. In that clause, it's Section J. It talks about what happens in the event of default. In the event of default, the contractor has to return unliquidated performance-based payments. Okay, sure. Conversely, question, Your Honor? Yes. So, 52-232-32C3, FAR. It says, performance-based finance amounts paid prior to payment for delivery on an item shall be liquidated by deducting a percentage or a designated dollar amount from the delivery payment. Right. Where are you, Your Honor? FAR 52-232-32C3. Okay. Go ahead. Delivery payment means a payment for accepted supplies or services, including payments for accepted partial deliveries. Commercial financing payments are liquidated by deduction from these payments. The contract says the government shall accept or reject the system within 30 days from final migration of live legacy production data to the reposted MOCAS. The board found that the government formally rejected the reposted MOCAS. No acceptance. No acceptance, no liquidation. What's wrong with that analysis? I don't know that there's a regulation that says the analysis that you just put forth. The regulation that was applicable in the contract was the 2002 version of this clause, and the 2002 version of this clause discusses that if performance-based payments are on a whole contract basis, as the government alleges, liquidation shall be by either pre-designated liquidation amounts or liquidation percentages. That pre-designation is a function of the contracting officer, and the record is clear that the contracting officer didn't put a liquidation schedule, a liquidation rate, a liquidation table of any type in the contract, as the contracting officer was obligated to do. Section J discusses the fact that if the contract is terminated, the contractor shall, on demand, repay the amount of unliquidated performance-based payments. What is liquidated and what is unliquidated? That's where we went a minute ago. The contractor had eight performance-based payments in the contract that were subsequently broken into smaller payment events. At each of those performance-based payments, the contractor had to demonstrate with verifiable subjects that it was entitled to be paid. You're saying they were accepted. I'm saying that they were accepted. I also want to point out... You're flying in the face of the contract language. How so? When I read you, let me read it again. The contract specifies, quote, the government shall accept or reject re-host MOCAS system within 30 days from the final migration of live legacy production data to the re-hosted MOCAS. Is that not there? I understand that's there. I also understand that the contract has a provision that unliquidated progress payments need to be returned and that liquidated progress payments get to be kept by the contractor. I can also tell you that the contracting officer who wrote the contract originally was of the position five times that the performance-based payments were liquidated when paid. I understand that the government has cited some cases about information and the contracting officer's final decision is subject to de novo review. That's true on facts. This is a contract interpretation question. It's a question of law. Why is the contracting officer's subjective understanding of the payment status carry any weight here? Because the contracting officer wrote the contract and the contracting officer's own interpretation of what he meant should be controlled. Okay. You're in unibail. How about we hear from the government and we'll save the remainder. May it please the court. The termination for default was properly sustained because in this case the contractor delivered non-conforming goods. The contract was required that there be 100% functionality and there was not 100% functionality. Your friend says there was and your friend says there was plenty of evidence on the record to support his position and not enough by the government. The board cited overwhelming evidence to the contrary. For example, there was an interface to the shared data warehouse that had to work. This was a function that had to work. That function did not work. Who was supposed to do the testing? I mean you say whether it worked or did not work. Who was supposed to go in there and make that determination? Was it the government's people or the contractor's people? The contractor was supposed to deliver a system that it had fully tested and then there would be the period of government testing of the functionality. That was the first 90-day period that the contractor failed. During that period the government evaluated the system and it was undisputed that this interface to the shared data warehouse did not work. You had testimony from three witnesses, a Mr. Jackson, a Ms. Turner, and a Ms. Schreiber, all testifying that the interface did not work. Are we talking about, because there's a quibble over which date we should be looking at, the pre or the post, so are we on the April 10th, 2017? The testimony that I cited from Jackson, Turner, and Schreiber does go also to the very end, after April 10th. It didn't work before and it didn't work afterwards. There were other aspects, other functions that did not work after April 10th and there's testimony to that effect. Testimony from Turner and Thompson that the progress payment function, this is the way that you were able to make payments. Was there contrary evidence in the record? Did the other side come in with its experts or its people and say, no, they're wrong, it was 100% functional? The contractor called only one witness and that was a witness from Carnegie Mellon. Actually, their testimony was that the system that was delivered was unstable, was unusable, and they thought that the government should start all over again. That testimony was cited by the board. That's the only witness that the contractor called. Why don't you move on to the liquidation question? On the liquidation question, the contract is absolutely clear. What's at issue are the four provisions. In particular, we agree that if it's unliquidated, the government can recover it. If it's liquidated, the government can't recover it. The core question is what's liquidation? Yes, exactly. FAR 52.232-32D tells us what liquidation is. It says performance-based financing amounts paid prior to payment for delivery of an item shall be liquidated by deducting a percentage or designated dollar amount from the delivery payment. What it distinguishes between is the performance-based payments. That's what I read to your brother. Yes. We're aware of it. Yes, that is the crucial clause. It distinguishes between the delivery payment and the performance-based payment and says that liquidation occurs when there's a deduction from the delivery payment. This contract also includes FAR 52.232-1, the payments clause, which is the ordinary FAR clause that's included in government contracts. That states that the government shall pay the contractor upon submission of a proper invoice the price stipulated in the contract for supplies delivered and accepted. That also explains that you have to have a delivery and an acceptance of the delivery before you have a delivery payment. In this case, as the court did read and point out, there never was a full delivery. CLIN number one was never fully delivered, and it was never accepted. Because of that, there never was a final voucher for CLIN one, and there never was a delivery payment, and so the financing payments were never set up against the delivery payment. For example, if the contractor had done everything they were supposed to do in this case, if they had delivered a fully compliant system, what would have happened is they would have tendered the goods, it would have passed the first 90 days, passed the second 90 days, and they would have tendered a final invoice. At that point, the price is roughly $14 million. Against the $14 million, you would have set off whatever financing payments, in this case they were performance-based payments, you would have set off that amount and the contractor would have gotten the remainder. For example, if $13 million had been paid as financing payments prior to final delivery, then they would have gotten the other $1 million. Effectively, in this contract, if everything had gone right, the full amount of the financing payments would have been liquidated after final delivery, which is effectively a 100% liquidation. Here they are saying that the contract is defective because there is no percentage in there or any amount. It really isn't because there was only one delivery contemplated. If that delivery had been successful, then there would have been a 100% liquidation. So no liquidation and the payments were returnable? Not in this case. It's because there was a default, because they did not deliver conforming goods. The system was terminated. Which means that the performance payments could be reclaimed. Yes. So in that respect, it's the same result, whether it's a progress payment or a performance-based payment. In either case, if there is a default, the government recoups all of the payments. If the court has no further questions, we would request that it be affirmed. Three brief rebuttal points. On the performance-based payments issue, in the provision D on the liquidation, if the performance-based payments are on a whole contract basis, as the government is alleging, the government has an affirmative obligation to pre-designate a liquidation amount or liquidation percentage under a plain reading of this regulation. My friend alleges that essentially the contract had a 100% liquidation rate. But there's no liquidation schedule, there's no liquidation rate, there's nothing in the contract. It's our position that if the government is going to take that position, it needs to communicate that position in unmistakable terms in the contract. It's incumbent upon the government as the author of the contract to do that. And on the termination for default issue, we'll just draw the court's attention to Appendix 1411 through 1412, which was Ms. Turner, the lead tester's testimony, that there was no testing after the GT&E period ended. And a little context. I'm sorry, that would be Appendix 1038 through 1039. And then some context on the Carnegie Mellon testimony. The Carnegie Mellon witness testified that the re-hosted system was an improvement in every measurable over the system that the government provided. So the we should start all over was really starting all over by fixing the as-is MOCAS before you do this project again. And that's all. Thank you. We thank both sides and the cases submitted. And that concludes our proceedings for this morning. All rise. The honorable court is adjourned until tomorrow morning. It's an o'clock a.m.